Original

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

12 CRIM 088

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

      -v.-          :

DAVID HIGGS,          :

      Defendant.          :

- - - - - - - - - - - - - - - x

**INFORMATION**

12 Cr.



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: FEB 01 2012

<u>COUNT ONE</u>
(Conspiracy To Falsify Books
and Records and Commit Wire Fraud)

The United States Attorney charges:

<u>**Relevant Persons and Entities**</u>

1.    At all times relevant to this Information, Credit
Suisse Group ("CS") was a global financial services company
headquartered in Zurich, Switzerland.  CS was organized into
three divisions: Investment Banking, Private Banking and Asset
Management.

2.    At all times relevant to this Information, CS's
American Depository Receipts traded on the New York Stock
Exchange.

3.    At all times relevant to this Information, CS was
required to comply with the federal securities laws, which are
designed to ensure that a company's financial information is
accurately recorded and accurately disclosed to the public.
Specifically, pursuant to the Securities Exchange Act of 1934 and

the rules and regulations promulgated thereunder, CS was required, _inter alia_, to make and keep books, records, and accounts that accurately and fairly reflected CS's business transactions.

4.   At all times relevant to this Information, DAVID HIGGS, the defendant, was employed as a Managing Director in the Investment Banking Division at CS.  HIGGS was based in CS's London, United Kingdom office.  At all times relevant to this Information, HIGGS reported directly to a co-conspirator not named as a defendant herein ("CC-1").

5.   At all times relevant to this Information, CC-1 held the position of Global Head of the Structured Credit Group in the Securities Department of the Investment Banking Division of CS.  The Structured Credit Group, among other things, warehoused and traded ABS ("Asset Backed Security") cash bonds, which included Residential Mortgage Backed Securities ("RMBS") and Commercial Mortgage Backed Securities ("CMBS").  CC-1 divided his time between the London, United Kingdom and the New York, New York offices of CS.

6.   During the relevant time period, CC-1 oversaw and managed a number of trading books, including a trading book known as "ABN1."  The ABN1 book was comprised primarily of several thousand individual long and short subprime-related positions.

2

The long positions, in which a write-down of tens of millions of dollars ultimately occurred, consisted of, among other things, various types of cash securities, including AAA-rated and non-AAA-rated cash bonds.  About 500 single name ABS cash bonds, half of which were originated during the second half of 2005 or later, accounted for $3.5 billion of the ABN1 book.  Prior to March 2008, ABN1 had a net asset value of approximately $5.35 billion, approximately $3.71 billion of which consisted of ABS cash bonds, including RMBS and CMBS positions.

7.   At all times relevant to this Information, two co-conspirators not named as defendants herein ("CC-2" and "CC-3") were employed as traders at CS, where each held the title of Vice President.  CC-2 and CC-3 were responsible for the day-to-day marking of two trading books overseen by CC-1, including the ABN1 book.  CC-2 and CC-3 were both based in CS's New York, New York office.  They generally reported to DAVID HIGGS, the defendant, who in turn reported to CC-1.

8.   At all times relevant to this Information, another co-conspirator not named as a defendant herein ("CC-4") was a CS employee responsible for data entry in the ABN1 book, among other things.  CC-4 was based in CS's London, United Kingdom office.  CC-4 reported to DAVID HIGGS, the defendant, and CC-1.

## **Background**

9.   CS traders were required at all relevant times to price securities they held at their fair value, that is, on a "mark-to-market" basis, determined by reference to the current market price of the asset or liability, or the current market price for a similar asset or liability.

10.   The deterioration throughout 2007 of the real estate market in the United States, including the subprime housing market, led to significant reductions in valuations of mortgage-backed securities.  As mortgage delinquencies increased across the country, the value of the securities backed by these mortgages decreased, and the market for them became increasingly illiquid.

11.   In the absence of a liquid market, CS traders were required to look to other indicia in order to determine the fair value of the assets on their books.  For example, during the relevant time period, the ABX Index served as a benchmark for certain securities backed by home loans.  It was widely understood within CS that traders were to consult the corresponding ABX indices when pricing RMBS subprime bonds and related products in order to value the assets on their books.

## Overview of The Scheme To Defraud

12.   From at least in or about August 2007, through and including in or about February 2008, DAVID HIGGS, the defendant, together with his co-conspirators, manipulated and inflated ABS cash bond position markings in the ABN1 book in order to achieve specific daily and month-end Profit & Loss ("P&L") objectives; in other words, they artificially increased the price of bonds in order to create the false appearance of profitability in that trading book.  HIGGS engaged in this scheme in order to enhance his apparent job performance and his eligibility for bonuses from CS.

13.   As a result of the scheme executed by DAVID HIGGS, the defendant, and others, there was a growing disparity between the values ascribed to the marks in the ABN1 book and the available external benchmarks, such as the ABX Index.  Indeed, from at least in or about August 2007 through the end of 2007, as ABX Index prices fell, bond prices in the ABN1 trading book that corresponded to the ABX Index remained effectively stable.

14.   During the relevant time period, and in order to effect the fraudulent scheme, CC-1 directed DAVID HIGGS, the defendant, to reach specific P&L targets on a daily and month-end basis.  HIGGS, in turn, instructed CC-2, CC-3 and CC-4 to mark the books so as to achieve the particular P&L targets specified

by CC-1, rather than to reflect the fair value of the bonds.  To accomplish this goal, the team, among other things, marked up bond prices without regard to fair value; improperly offset mark-downs with gains realized in other parts of the book to avoid a P&L impact; and engaged in the practice of "reversing out," which involved freezing marks at a favorable point in time to achieve a desired P&L result.

15.  As a result of the scheme, DAVID HIGGS, the defendant, and his co-conspirators, gave CS senior management the false impression that the ABN1 book was profitable, and caused CS to report false year-end numbers for 2007.  At the same time, HIGGS was able to secure a significant year-end bonus for himself because, as he was well aware, bonus amounts were largely determined by trading books' profitability.

**HIGGS And His Co-Conspirators Knowingly Mismark Bonds**
**In Order To Achieve P&L Targets And Hide Losses**

16.  Beginning in or about the fall of 2007, DAVID HIGGS, the defendant, and his co-conspirators, began to manipulate the bond marks in the ABN1 trading book in order to hide their declining value and create the false appearance that the ABN1 book was profitable.  Set forth below are examples of conversations, recorded pursuant to CS's London office policy, in which HIGGS and his co-conspirators discussed, among other

things, their P&L objectives, their efforts to reach these P&L
goals, and their awareness that bonds in the ABN1 book were
significantly mismarked.

17.   During a telephone call on or about September 13,
2007, CC-4 informed CC-1 that there was a $10 million gain that
was going to be used to "write down some positions in ABN."  When
CC-1 asked "which positions?," CC-4 responded: "Just some bonds
that were over-priced."  CC-4 then asked CC-1 what P&L targets he
wanted to be met that day:  "If you want [P&L] to be a big number
let me know what you want, then I'll just go through it with Dave
[Higgs] because obviously I can move things back to where they
were ... if you're looking for a big number today ..."  CC-1 told
CC-4 he would call DAVID HIGGS, the defendant, to discuss this
matter.  Before CC-1 reached HIGGS, however, CC-4 told HIGGS to
get in touch with CC-1 "fast" because CC-4 had told CC-1 that the
they were "up 15 or 20" million dollars "in ABN1" and that CC-1
was "expecting to take some of that as P&L," that is, CC-1 wanted
to show that amount as profit instead of using it to offset
losses in other parts of the trading book.  HIGGS later called
CC-4 and confirmed that, just as CC-1 had indicated, HIGGS and
his co-conspirators would have to "show some" P&L; therefore, the
money gained could not all be used to "write down," or reduce the
value of, the over-priced bonds.

18.   During a telephone call on or about September 17, 2007, CC-4 asked DAVID HIGGS, the defendant, "What sort of P&L do you need today?"  HIGGS responded that all books should end the day "up" by $35 million.  CC-4 responded that the non-ABN books were up only $20 million.  HIGGS indicated that he was "looking for another 15 [million]."  CC-4 subsequently called CC-3 and stated that "Dave [Higgs] is looking for 15 [million]."  CC-3 thereafter artificially increased the prices of several ABN1 positions in order to satisfy the P&L directive.

19.   During a call on or about October 26, 2007, DAVID HIGGS, the defendant, and CC-1 discussed the P&L of each of the books, which HIGGS estimated to be "up 56 [million dollars]."  HIGGS then informed CC-1 that the prices on AAA bonds needed to be marked down.  CC-1 asked "how much" of the $56 million HIGGS wanted to "take ... to reserve against other things?," referring to the practice of using a particular day's gains to hide losses by waiting until a profitable day in order to perform necessary write-downs.  HIGGS proposed a $15 to $20 million markdown.  CC-1 did not accept HIGGS's proposal:  "That's a lot of money, dude." HIGGS reminded CC-1 that, among other things, "there [were] some AAAs" - i.e., AAA-rated bonds - "that ... need[ed] to be marked down."  CC-1 told HIGGS to "go with 15 [million] for now," and stated that he wanted to "be up 30" - i.e., $30 million in P&L -

because he was "trying to get a message across to some people."
In other words, CC-1 wanted to demonstrate to CS senior
management that his trading books were profitable.

      20.  At month-end, on or about October 31, 2007, CC-1
called CC-4 and indicated that he had seen CC-3's bond re-marks
and thought they were too low.  CC-1 asked CC-4, "What happened?"
CC-4 said, "I don't really know ... Let me find out from [CC-3]
where we are."  CC-1 stated that CC-3 "may have taken the re-
marks a little too far," and said that he would talk to DAVID
HIGGS, the defendant.  Not long after this call, CC-3 called CC-4
to say that HIGGS wanted CC-4 to reverse the $25 million re-marks
that CC-3 had made.

      21.  By at least late November 2007, CC-1 was aware
that the market for mortgage-backed securities had declined
enormously.  For example, on or about November 28, 2007, CC-1
told DAVID HIGGS, the defendant, CC-2 and CC-3 that "the housing
market [was] going down the tubes" and that they had to "find a
way to sell these bonds," referring to the mortgage-backed bonds
in ABN1.  As CC-1 recognized, "[t]hose bonds are going to start
trading worse than the [ABX] Index."  In a later call between
HIGGS, CC-2 and CC-3, CC-3 indicated that the market prices for
the AAA bonds – which HIGGS and his co-conspirators were marking
in the 90s – were in reality "in the low 80s."  Ultimately, CC-1

made the decision not to sell the bonds because the prices were so low.

### HIGGS And His Co-Conspirators Hide The Mismarks
### By Deflecting Inquiries From Internal Controls

22.  At all times relevant to this Information, price testing was an independent function with the Investment Banking division of CS ("Price Testing"), which was designed to ensure the accuracy of bond prices.  As part of their scheme, DAVID HIGGS, the defendant, and his co-conspirators, concealed their manipulation of bond marks from Price Testing and devised ways to avoid detection of their fraud.

a.  For example, on or about August 29, 2007, and in anticipation of scrutiny of certain month-end marks from Price Testing and senior management, HIGGS instructed CC-2 to obtain third-party marks from other dealers, intending to use these external marks as support when persuading Price Testing to accept HIGGS and his co-conspirators' high marks for a number of RMBS positions in ABN1.  CC-2 thereafter contacted Deutsche Bank and Barclays Capital, only to learn that the banks' marks were substantially lower than the marks CC-2 had made in ABN1.  HIGGS informed CC-1 of this development:  "The one bit of bad news at the moment is ... we got two sets of bond marks, two things from Deutsche and Barclay's, and they were not entirely good ... their

numbers they came back with were lower than the bond marks so we've gone out again to a number of different people to see if they will give us bond marks."

b. CC-2 subsequently sought the help of a friend who worked at a small regional investment bank in order to secure "independent" marks. In less than a minute, CC-2's friend generated prices on approximately 30 AAA bonds that were nearly identical to those recorded by CC-2 and his co-conspirators in the ABN1 book.

23. On another occasion, a Price Testing representative sent an e-mail to DAVID HIGGS, the defendant, and CC-2, in which he questioned a bond price: "Curious to know how the desk derived a price of $103.36 for [a particular bond] .... We're looking at a price in the mid 70's range." In response, CC-2 acknowledged that Price Testing was correct and told the Price Testing representative that "the feed from Bloomberg into [his] price sheet did not pick up the rating downgrade," and, as a result, had caused the higher mark to be recorded by mistake. The Price Testing representative forwarded CC-2's e-mail to other members of Price Testing with the note, "F/Y/I I'm not exactly comfortable with this response. Makes me wonder how carefully [the front office] is looking at these prices."

### Late 2007: Risk Management Begins
### To Question The Bond Marks

24.   In or about late 2007, senior members within CS's Risk Measurement & Management ("RMM") department began to raise questions about the valuation of AAA bonds in the ABN1 book.   On or about November 30, 2007, the head of Market Risk Management ("MRM"), a function within RMM, informed CC-1 via e-mail that the AAA bonds in the ABN1 book appeared to be priced too high versus the ABX Index:

> The weighted average AAA paper looks to be priced around 90% (see attached excel).   The figures seem pretty high to me (versus ABX), and wanted to know if I was missing something/had taken the wrong data.

In response to this inquiry, CC-1 promised to review the data while downplaying the similarity of his bonds to the ABX:

> Will have someone take a look.   Portfolio mix a bit different in that a good portion is non LCF and another portion is fixed rate underlying loans.

In other words, CC-1 represented that the bonds in ABN1 were not comparable to the ABX Index because "a good portion" of the ABN1 bonds were "non LCF," that is, they were not Last Cash Flow and were therefore more valuable.   CC-1 further suggested that ABN1 bonds were of higher value because they consisted of "fixed rate," as opposed to floating rate underlying loans.

12

25.   CC-1 later forwarded the e-mail from the head of MRM to DAVID HIGGS, the defendant, and asked HIGGS to analyze the AAA ABN1 portfolio so that CC-1 could form a "counter-argument," i.e., so CC-1 could convince MRM that the ABN1 bonds were of higher value than the ABX Index in order to justify the high marks.  HIGGS thereafter asked CC-2 to conduct the requested analysis, which CC-2 did.  The resulting spreadsheet (the "December 3 Spreadsheet"), which CC-2 distributed to HIGGS, CC-1 and CC-3 via e-mail on or about December 3, 2007, did not establish that the bonds in CC-1's trading books were of higher overall quality than the ABX Index.  Instead, the December 3 Spreadsheet showed, among other things, that those bonds in CC-1's trading books that were most comparable to the ABX Index – i.e., the AAA "LCF" ("Last Cash Flow") floating rate bonds – were valued at weighted average prices above 90, or 15 points higher on average than the corresponding ABX Indices.

26.   On or about the following day, DAVID HIGGS, the defendant, met with CC-1, CC-2 and CC-3 in the New York, New York offices of CS.  During that meeting, HIGGS and his co-conspirators discussed their AAA bond exposure with reference to the December 3 Spreadsheet.  Although CC-1 expressly acknowledged that the AAA bonds were priced too high and that a more accurate price would be closer to the ABX Index, CC-1 instructed HIGGS, CC-2, and CC-3 not

to make any significant markdowns at that time.

**2007 Year-End: The Mismarkings In The ABN1 Book Continue**

27.   On or about December 31, 2007, DAVID HIGGS, the defendant, instructed CC-2 regarding year-end marks for AAA bonds in ABN1.  Specifically, HIGGS noted that the LCF bond marks for the second half of 2006 and the first half of 2007 in the ABN1 book were "a bit too high," and asked CC-2, "Can we push those down into the 80s?"  HIGGS then directed CC-2 to "figure out which bonds we can re-mark against them" in order to flatten, or even out, the P&L impact.

28.   On or about the following day, CC-2 sent DAVID HIGGS, the defendant, an e-mail with a spreadsheet that included AAA LCF marks for month-end December 2007.  In the e-mail, CC-2 noted that he re-marked the book by (1) reducing the weighted average prices of certain vintages of LCF bonds to below $90; and (2) making as many offsetting marks as possible.  Instead of marking the bonds down to accurate levels, however, CC-2 marked the weighted average prices at 89.9, an adjustment "into the 80s" that was designed to avoid detection.  Moreover, the "offsetting marks" that CC-2 claimed to have done in ABN1 lacked any correlation to the AAA LCF bonds.

29.   A few days later, on or about January 4, 2008, DAVID HIGGS, the defendant, and CC-1 discussed the values of the

AAA bonds within the ABN1 book.  Specifically, CC-1 stated: "The dollar prices of our [AAA] floating rates and fixed rates honestly are quite high, right?"  HIGGS responded, "I agree they are quite high" and acknowledged that "they definitely should be marked down."  Later in the conversation, CC-1 expressed concern that the overpriced bonds were at risk of being discovered:  "We should mark these down because someone is going to spot this."  CC-1 further remarked that "on the fixed rates we have some room, but not on the floating rates, we don't."  In other words, CC-1 acknowledged that the floating rate bonds could not be marked any higher.  Additionally, CC-1 informed HIGGS that another trader who reported to CC-1 and oversaw a comparable portfolio of bonds was pricing his floating rate AAA bonds below the ABX Index.

30.  Nevertheless, just a few days later, on or about January 9, 2008, CC-1 reminded DAVID HIGGS, the defendant, that CS senior management expected their books to generate substantial revenue, stating, in part: "People are expecting us to make money. [The head of CS's investment bank] knows what our positions are. Today, we have to be up at least 10 [million] bucks."  As CC-1 recognized, however, any effort to find positive P&L was complicated by their history of mismarking positions: "I know it's hard when you've got things that aren't necessarily quite marked where they need to get marked."

31.   Although the AAA bonds in the ABN1 book were ultimately written down by approximately $35 million in the first half of January 2008, they nevertheless remained grossly overpriced in comparison to the ABX Index.   At January 2008 month end, CC-2 and CC-3, at the direction of DAVID HIGGS, the defendant, raised the prices on a number of AAA LCF bonds above their 2007 year-end levels.

### The February 2008 Mark-Down

32.   On or about March 20, 2008, CS issued a press release, announcing completion of its internal review and stating that the fair value reduction, or write-down, of the ABS positions – which includes but is not limited to the ABN1 book – was approximately $2.65 billion.

33.   Approximately $540 million of this write-down was attributable to the ABN1 trading book and included ABS cash bonds for the fourth quarter 2007 that the co-conspirators manipulated and inflated in connection with the scheme described herein.

### Statutory Allegations

34.   From at least in or about August 2007, through and including in or about February 2008, in the Southern District of New York and elsewhere, DAVID HIGGS, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to

commit offenses against the United States, to wit,

(a) falsification of books and records, in violation of Sections 78m(b)(2)(A), 78m(b)(5) and 78ff of Title 15, United States Code, and Title 17, Code of Federal Regulations, Section 240.13b2-1; and

(b) wire fraud, in violation of Title 18, United States Code, Section 1343.

### Objects of the Conspiracy

### False Books and Records

35.  It was a part and an object of the conspiracy that DAVID HIGGS, the defendant, and others known and unknown, willfully and knowingly, would and did, directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Securities Exchange Act of 1934, namely books, records, and accounts of Credit Suisse, an issuer with a class of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934, which Credit Suisse was required to make and keep in reasonable detail, accurately and fairly reflecting the transactions and dispositions of the assets of Credit Suisse, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

**Wire Fraud**

36.  It was further a part and an object of the
conspiracy that DAVID HIGGS, the defendant, and others known and
unknown, willfully and knowingly, having devised and intending to
devise a scheme and artifice to defraud, and for obtaining money
and property by means of false and fraudulent pretenses,
representations, and promises, for the purpose of executing such
scheme and artifice, would and did transmit and cause to be
transmitted by means of wire, radio, and television communication
in interstate and foreign commerce, writings, signs, signals,
pictures, and sounds, all in violation of Title 18, United States
Code, Section 1343.

**Means and Methods of the Conspiracy**

37.  Among the means and methods by which DAVID HIGGS,
the defendant, and his co-conspirators, would and did carry out
the conspiracy were the following:

a.   HIGGS and his co-conspirators recorded and caused
others to record falsely inflated marks for ABS cash bonds in the
ABN1 book.

b.   HIGGS and his co-conspirators thwarted efforts by
CS personnel to determine accurate marks of the ABS cash bonds in
the ABN1 book by, among other things, providing misleading and
incomplete information in response to inquiries.

c.   CC-2 used false "independent" marks that were obtained through round-trip e-mail exchanges in order to support certain inflated marks in the ABN1 book.

d.   HIGGS and his co-conspirators used interstate and foreign wires in furtherance of the objects of the conspiracy.

### Overt Acts

38.   In furtherance of said conspiracy and to effect the illegal objects thereof, DAVID HIGGS, the defendant, and his co-conspirators committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On or about August 29, 2007, CC-2 sent an e-mail from New York, New York to Florida.

b.   On or about September 13, 2007, CC-1, who was in New York, New York, had a telephone conversation with CC-4, who was in London, United Kingdom.

c.   On or about November 28, 2007, HIGGS, who was in London, United Kingdom had a telephone conversation with CC-1, who was in New York, New York.

d.   On or about December 1, 2007, CC-1 sent an e-mail to a member of CS's RMM department.

e.   On or about December 3, 2007, CC-2 sent an e-mail to HIGGS, CC-1, and CC-3.

f.   On or about December 7, 2007, CC-1 sent an e-mail

to CS's Chief Risk Officer in New York, New York.

       g.   On or about December 31, 2007, HIGGS had a telephone conversation with CC-2.

      (Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

      39.  As a result of committing the foregoing offense, in violation of Title 18, United States Code, Section 371, DAVID HIGGS, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense.

      (Title 18, United States Code, Section 981(a)(1)(C),
      and Title 28, United States Code, Section 2461.)

## Substitute Asset Provision

      40.  If any of the forfeitable property described in this Information, as a result of any act or omission of the defendant:

         a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited
     with, a third person;

c.   has been placed beyond the jurisdiction of the
     Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which
     cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18,

United States Code, Section 982(b) and Title 21, United States

Code, Section 853(p), to seek forfeiture of any other property of

the defendant up to the value of the forfeitable property

described above.

    (Title 18, United States Code, Sections 371, 1343, and 981;
       Title 21, United States Code, Section 853(p); and
       Title 28, United States Code, Section 2461.)


_Preet Bharara_
PREET BHARARA (MPS)
United States Attorney

21